Robert Rainwater on behalf of Mr. McCartney. This case involves two issues, the first being an issue of a Fourth Amendment search-and-seizure issue. And I want to point out what this case involves. It involves a basically a four-year investigation by ATF agents into possible illegal possession of illegal weapons by my client, which during that time they failed to come up with any probable cause testifying a search of his person, vehicle, or home. So after not being able to do that, the ATF agent then calls a Kern County Sheriff's officer and says, find some probable cause to make a stop of the vehicle. The Kern County Sheriff's officer then makes a stop for what he characterizes in his report as an inoperable great flight. We have no definition at that time what inoperable means. We do know from the evidence that the brake light had the clear plastic red shield on the taillight assembly had been broken and that tape had been put over there, red tape. When he tested that... That kind of transparent tape you buy at the auto parts store, that's when you say red tape? Exactly. Yeah, yeah, okay. So initially there was some question about whether or not he was saying it was inoperable because of the tape over the rear light. Or whether or not there was some other reason for being inoperable. He testified at the hearing that for the first time we found out that he said it didn't shine. Not that having reflective tape or clear tape that reflected through it was a violation of the California Vehicle Code. Basically, we had heard from our client, of course, that the taillight worked. So I sent an investigator out who made a videotape of the taillight and showed that it shined. Now is it a violation of the Vehicle Code to have tape instead of the original lens? There are certain requirements in the Vehicle Code. It has to be red. It has to be seen for a certain distance. There is no requirement that it has to be either clear plastic or any other material. So long as, in other words, so long as that transparent red tape allows the light to come through with sufficient intensity, that's enough? Right. I think it requires it to be seen from 350 feet or something like that. I don't remember the exact number of feet, but there's a certain number of feet it has to be seen from. It has to be red. So, you know, I think the evidence supports basically what probably happened here is the officer stopped it based upon seeing a broken taillight. At some time between then and his testimony, he realized that a broken taillight or a with a red tape over it doesn't violate the code and then testified that it was inoperable and that it didn't shine, which I think beyond a reasonable doubt at the hearing, we presented evidence that it did work. We presented a videotape which clearly showed that it worked when it was recovered at the impound lot and that there was testimony that the impound lot takes steps to preserve the evidence. The government had agreed to release it to my client's son prior to him obtaining custody of it. I understand all this and I'm sympathetic with the argument, but I think I have a district court finding that the officer's testimony that it did not illuminate was truthful. What do I what do I do with that? I don't think we have that for several reasons. He tested or he ruled at the first hearing, basically, that he had an officer who was saying it didn't illuminate and then that he had other evidence. I mean, I'm reading to you from page 16 of the district court's order. Which order? The I assume you mean the order after the motion for reconsideration or before? It's before. He says he believes the officer. Right. And then he said at the motion for reconsideration that he had believed the officer because he didn't have any other evidence to establish why there would be or he had evidence. I'm sorry if I could start over. I'm confusing the court. He basically said he didn't want to call the officer a liar because he had evidence from the government that it could have been an intermittent fault based upon the testimony of a mechanic that if the wiring or the bulb or other things were faulty, that he based upon that and therefore he didn't call the liar an officer because they had alternative explanation. Then what happens is we present evidence at the motion for reconsideration that all that was based upon a false assumption. Number one, an assumption that Josh McCartney destroyed the evidence and it couldn't be tested, which was false, and we presented evidence that it was had been retained. We took it to an expert who examined it, determined it was not faulty. And then instead of then making a determination after the motion for reconsideration whether the officer was credible or not, he just didn't make any finding and basically said, well, I'm going to rule that the defense in some way hid this evidence from the government or didn't allow the government to discover it and therefore rule against the defense because I don't believe Josh McCartney's testimony about it working on the day it occurred. So I think in the end, after the motion for reconsideration, when he found out those facts were incorrect, he didn't make a credibility determination. There's nothing in the motion for reconsideration. In fact, the motion for reconsideration, he talks about how he relied on the government's testimony, and that probably was wrong. Yes. You know, I think your real problem here is with the collective knowledge of law enforcement. And you seem to think that one law enforcement agency can't know to have to share its knowledge with another. Why is that? Well, I'm just reading the Ninth Circuit case law. I think if they're working together or if they're in a task force of the same agency, sure, they can share their knowledge. But and I point out in Ramirez, the first pair or sentence of Ramirez is this involves an investigation among officers of the same agency who are conducting the investigation. So there's a barrier to that. But why does it create a barrier? Well, I cite the Morales case, which basically says, unless it's the same agency, that you must have you must give that other agency information. For example, in this case, it was a Kern County sheriff. The only information they had was there was an informant who said Mr. McCartney had a machine gun. They had no information about, you know, whether that was reliable, whether she had been a victim of an offense, whether she was in a car accident, whether she was  They had no information. So there's a barrier. And that's not sufficient to just call up some other agency who has no knowledge and make that under the Ninth Circuit case law. Why should that be the rule? I'm not sure if I'm qualified to say why that's the rule. I think that's the rule in the Ninth Circuit as I read Ramirez and Morales. I think that rule protects us from what happened in this situation, where basically one agency can rely on another agency to make an arrest and sanitize their probable cause without having to give it to them, basically. It protects us from what happened. What happened in this case is that a man with a lot of machine guns was detected. That's the substantive result. It's a good result. It's not good for your client, of course. Well, I'm not sure if it's a good result in terms of the protection of the right to be free from unreasonable searches and seizures. And I think what happens here is we violate that right by having a man searched when there's no probable cause. And the ---- Let me ask you this one. It's kind of a follow-up on Judge Newman's question. If we allow this attribution of knowledge so that we give to the arresting officer, impute to him the knowledge possessed by law enforcement agents generally, do you say there's no probable cause for the stop? Yes. Because? Because the only thing that the officer who made the stop knew ---- No, I'm imputing to him the knowledge possessed by other law enforcement people. Imputing to him the knowledge that the agent had? Yeah, yeah. Well, the agent doesn't have any real knowledge either. He has, from what we know, he hears from this witness that she says, Mr. McCarty's at my house with a machine gun. He has no knowledge of why she knows he has a machine gun, what information she has. She said in the past he reportedly has a machine gun in her statement. He goes to her house. He doesn't see Mr. McCarty. He doesn't ---- he sees a white vehicle where he sits there for two or three hours. He doesn't see Mr. McCarty come and go in his white vehicle and then testifies that, well, I must have been looking at the wrong one. So he can't even corroborate that Mr. McCarty was there. She then calls him and says, Mr. McCarty's at a Winco. He goes to the Winco and sees Mr. McCarty there. But I don't think that's sufficient probable cause, because he can't corroborate any of the information she gave him. Outside of trying to corroborate it with information that at that point was three years old from other informants who had said he reportedly had machine guns. Kennedy. Well, she corroborated that he was at the store where the informant said he'd be. Right. She did ---- he did corroborate that she told him he was at the Winco. I don't know how that establishes any more information that she had about him outside of the fact that he knew he was going to a grocery store. And they found him there. Correct. But there's no information to show that her knowledge of him having any illegal activity is corroborated or shows that it's correct. And, in fact, we have the affidavit which shows that these other informants who had said that Mr. McCarty back in 2003, 2004 had had a machine gun also put him there that they eventually went shooting with him, and they said he had no machine guns. And she admitted that this alleged group that the first three informants talked about had stopped meeting at the time that the stop here occurred because the people moved away. So he was no longer involved in that group. I think there's a lack of probable cause in that regard. Secondly, just to go briefly to the ---- if the stop is invalid, we ---- it's our position that the search of the house is also invalid. I think it's pretty clear from the evidence that the officer called and asked for somebody else to stop the car for probable cause that he would not have sought a warrant because he didn't believe he had probable cause. And even if we then excise that they found a gun in Mr. McCarty's vehicle from the they don't even put down in the warrant any allegation that this third informant or the fourth informant said that he had a gun in her residence. That's not in the warrant. The only thing in the warrant is the prior information, her statement that she believes he's been told that he has machine guns and the fact that he found it in his car. So I think that's insufficient. Finally, I'd like to touch briefly on the last argument we make, which has to do with the Second Amendment. And I'd like to point out we're not saying that a person has the right to possess any weapon they want at any time. We're saying that a person has the right to possess the kind of weapons in this case and for the purposes in this case, which are the core purposes of the Second Amendment, which is protection of the home, and that reviewing it under strict scrutiny, that can't be prevented in this case. Now, I'm willing to assume for purposes of this case that Heller is the across the board, I mean, applies not only to the District of Columbia, but elsewhere and so on. But it seems to me that the Heller opinion leaves quite a bit of room for outlawing or controlling things like machine guns. I think there's a broad definition of machine guns, for example. This case, we have guns which have been, which would be lethal, which are basically modified to shoot rapidly, and then qualify as machine guns. We can also think of machine guns as things we see in World War II that have to be put on a tripod with tons of bullets hanging out of them. Those are different weapons. And my analogy, I'm sorry, I don't mean to be rude. Aren't those weapons called Sten guns? I'm sorry? The ones on the tripod. Aren't those weapons called Sten guns? I'm not an expert on that, so I don't know. But we had an expert testify in this case. I believe that these guns are basically rifles that have been modified to shoot more than one bullet with a pull of a trigger. And I don't see the distinction. So as I understand it, you pull the trigger and it continues to fire so long as you're holding the trigger. Yes, that's the definition of a machine gun. And my point is, I don't see that distinction between the Supreme Court saying we can have a Glock 9 in Heller, which is a gun that can hold 15 rounds and shoot as quick as you can pull your finger, when they had, back in Revolutionary War days, flintlock muskets that were basically cut off as could be handguns. I don't see the distinction between then flintlock rifles and rifles that, by technology, shoot faster these days in terms of the common and usefulness of them. We also try to point out how there are lots of waffle uses for these type of weapons. In fact, in Tennessee, I believe it is, they have an annual shoot every April and they bring their machine guns and shoot them. So I think that if we apply the strict shooting standard, this law cannot be read this broadly to prohibit the actions that occurred as applied in this case. And I would point out that the district court basically implied a, or used an interest test. They balanced the interests of society in not having machine guns or these types of weapons because of the dangers to society against the benefits. And that test was specifically thrown out by the Supreme Court and ruled that's not the test in deciding a Second Amendment case. I don't have much time left. I'd like to reserve whatever time for rebuttal. Thank you. Roberts. Thank you. Roberts. Thank you. Kagan on behalf of the United States, I'd like to go to the collective knowledge just to start. As I read the Morales case that counsel relies on, that's got nothing to do with the collective knowledge. One law enforcement agency sent another law enforcement agency an anonymous tip, and then this Court correctly said, you just can't rely on some other agency told you. You have to go behind it and see is that tip you got sufficient. They found it was an anonymous tip. There wasn't enough basis behind that information to justify a stop by the second agency. That's got nothing to do with this case where the collective knowledge here, the ATF agent has all that knowledge. If his knowledge is sufficient, then you can have the stop. The officer making the stop doesn't know what it is, but under the collective knowledge doctrine, you can rely on it. Our position, there's a lot of different legal arguments here. Our position is, among other things, that we don't even have to assess the legality of the traffic stop, because the defendant didn't plead guilty to any of the weapons found in his car at the time of the traffic stop. There was a search warrant for his home. That's where the illegal weapons were found. That's what he pled guilty to. And you just redact from that search warrant the information about this traffic stop, and then you go through what's there. I can go through it. The court's got that search warrant in front of it. Basically, starting in October 2003, three different citizens keep reporting basically the same thing, that the defendant's very anti-government. He's got some irrational beliefs, either has or wants to get machine guns. There's mentions of hand grenades. And then this last citizen, and each time, this is not an anonymous person. It's not a person seeking a deal in a criminal case. It's a citizen. They may have certain biases against the defendant, but they're not criminals working a deal. She says he's getting more extreme. He's buried guns hidden in his house and on his property, and he's reported this is in April of 07, that the end of June 07 would be the beginning of the end. And this incident happens in late May of 2007, this car stop. The district court, let me turn to what factual findings the district court did or did not make. And it's a little bit of a complicated factual statement in the court below, or factual procedure. There's an initial motion to suppress. The Kern County deputy testifies that the car stopped and he couldn't see a brake light. And counsel's correct, I looked in the record. His police report just simply says it's inoperable. The defense then puts on their investigator and the defendant's son who say that they went to the impound lot about a month later where this car was, brought it out, operated the brake, and the light shined. That the taillight was covered with tape, but it worked. And the only thing that's wrong with the taillight is that the lens cover, the plastic piece that goes over there, was broken and had been replaced. There's nothing at that point about where is this taillight assembly. It turns out the son also testifies that he's replaced it. He says he's replaced the entire thing. The district court, then the government goes and gets an expert who says there's a lot of things that can cause intermittent failure. The brake light comes on, sometimes doesn't come on, other times goes through wiring, corrosion, dirt in there, bulbs, et cetera. Then the defendant comes up and says, no, we've got the taillight assembly. There's a dispute then at the reconsideration that the wires are cut and about whether or not there was a plug-in, whether the assembly is a plug-in or you'd have to cut it. And counsel, what's happening is the counsel for the government are different people than the person that presented the original hearing. Counsel for the defense says he doesn't remember a diagram that shows a plug or  The excerpt of record does show that there was, in fact, a diagram that does show that socket. That's at excerpt of record volume two, page 120. The district court goes back to, and the district court is clearly frustrated with the defense about, and I'm going to quote the district court, you don't protect the facts, you don't present the facts. You don't protect them, you don't present them. Then you come back here and tell me I'm wrong when you present supplemental facts. He returns to his original finding. He notes that there was, at first, nothing about it being preserved. There's no advance notice that was going to be tested. But there's no reason that you would replace the entire taillight assembly if all that's wrong is that the lens cover is broken. The district court heard both the defendant's son and the Kern County deputy sheriff testify. I don't think there's any question, any doubt about the credibility of the Federal Defender Investigator. But the deputy and the son, that could be there. He's seen both of these people testify. And the court's clearly troubled by the defendant's son's actions. That's how he phrases it. And he says that there was no reason to replace the entire assembly if the only thing that was broken was the lens. And that's at the reconsideration. It's at page 105 of volume one of the excerpt of record. The Kern County deputy, the district court says he's going back to his original finding, and he says there's no basis to question his credibility. And that's in the written decision. It's an excerpt of record, volume one, pages 138 and 139. He says he's not acquainted with this defendant. It wasn't a Kern County investigation. He's got no bias there. That's the record we have. I think we can infer from that if there was a credibility contest, the district court favored the deputy as opposed to the defendant's son. It's also possible that there was an intermittent failure, and both of them are telling the truth that the break didn't happen to work that night. Either way, as I indicated, we see it as the government wins. There's good reason for the deputy to stop the car based on the district court's factual finding. There's a taillight out, and then there's legal search from there. There's collective knowledge. There's an informant who is corroborated by all the other people, saying consistently the same things about this man. Corroborated, obviously, she knows what he's up to at this point in time, because she says where he is, and sure enough, he's there. There's a stop on that. And just as significantly, there's an independent search warrant that yields the evidence. Finally, I think the Court's very ---- We don't get to say it was found, therefore, there was probable cause. That last point doesn't work very well for you. Oh, if I said that, I'm sure those words came out of my mouth. That's not what I meant to say. The Heller case, it's Section 3 of the majority opinion, talks about the rights secured by the Second Amendment are not unlimited, and that the historically, even at the time of the Second Amendment, dangerous and unusual weapons were prohibited. You know, machine guns, landmines, hand grenades. Now, wait a minute. Where does it say machine guns, landmines, hand grenades? It doesn't say that. Oh, OK. Because I've been looking for that, and I can't find it. It says dangerous and unusual weapons. Now, how dangerous and how unusual are the weapons here? I think the landmines and hand grenades, I would characterize at least for domestic use, are certainly unbelievably dangerous and unusual. I think there's no question about that. Machine guns, extremely dangerous. Again, I'm not a weapons expert how unusual they are. I know there are certain States that if they're registered, it is legal to possess a machine gun. State of California, it's not. My problem is not with your characterization of it. My problem is trying to figure out what the Supreme Court meant by that. I mean, a Glock is a dangerous weapon, too. Right. It's, I would submit, it's not unusual. I would submit a machine gun is relatively unusual. You know, I don't know if we're going to get into it. A Glock can be turned into a machine gun by the use of a file. I'll defer to your knowledge. Oh, look, I grew up in the Bronx, all right? I was born in Queens. Okay. Well, you know the kids from the Bronx. Fort Apache and all the rest of that stuff. But really, it's all it takes. Yeah. No, I think any semi-automatic weapon can really very easily be converted to a fully automatic weapon. There's no doubt about that. And the question is whether under the Constitution that can be prohibited. I'm happy to entertain any questions from the Court. Otherwise, I'd submit it. I think not. Thank you. Response. I just have a couple of quick points. Mr. Rooney, I believe he said that Mr. McCartney didn't plead guilty to the possession of the machine gun they found in his car. But my understanding is he pled guilty to three counts of possession of a machine gun, one in his car and two at his house. But so I don't think that's true. Secondly, the socket issue is purely a red herring. It has nothing to do with whether the bulb worked or not or whether the light shone. They had an expert who examined it. He couldn't come up with anything to help them out. We had an expert examine it. It works perfectly. When you say it, what are you talking about? The brake and taillight assembly. The original one that had been taken out? Yes. Now, but it had been taken out by the sun. I have to say I share the court's puzzlement. If you've got a problem with the lens, you replace the lens. Why does he take out the whole assembly? I don't see the court as being that puzzled by that, but I don't know why he took out the whole assembly. He's a 19-year-old kid. But whether he took out the whole assembly or just the lens doesn't change the fact that the assembly works when we take it to experts who analyze it and say it works perfectly. Whether he chose to splice it in the middle or do a whole assembly and plug it in or just to get a new lens. In the end, I guess I have my problem. Confronted with all of this, the district judge didn't change his mind that the officer was telling the truth. I'm not sure that that's – I don't believe that's correct. That was the final point I was going to get to on that. I think what the district court did is made a – he made a ruling on the credibility at the original hearing. Once we presented the additional evidence and showed that he had made a ruling on incorrect facts, he basically then got upset about making a ruling on incomplete facts and didn't make any ruling. He just said, well, I'm going to go back to my previous ruling, which we know at that point was based on the wrong facts. Okay. And that's my position. Thank you very much. Thank both sides for your useful arguments. United States v. McCartney, now submitted for decision.
judges: Duffy, Noonan, Fletcher W.